Vernie S. Belcher and Bessie L. Belcher v. Commissioner.
Belcher v. Commissioner
No Docket No. in original
United States Tax Court
T.C. Memo 1958-180; 1958 Tax Ct. Memo LEXIS 235; 17 T.C.M. (CCH) 908; T.C.M. (RIA) 58180; September, 1958
*235 None of the returns were false or fraudulent and these proceedings are not timely under section 276(a) of the 1939 Code. Respondent failed to show that petitioner for the year 1945 omitted gross income in excess of 25%. Michael Gould, Esq., 1116 Woodward Building, Washington, D.C., for the petitioners. W. Ralph Musgrove, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and additions thereto under sections 293(b) and 294(d), Internal Revenue Code of 1939, [1] as follows: Additions to Tax
Sec.
Sec.
Year
Deficiency
293(b)
294(d)
Docket No. 64143
1942
$ 2,378.08
$ 1,189.04
1943
2,683.43
1,135.32
1944
3,062.66
1,531.33
$ 294.11
1945
6,298.73
3,149.37
390.82
1946
29,749.47
14,874.74
2,814.51
1947
13,722.42
6,861.21
867.87
Docket No. 64144
1948
21,308.80
10,654.40
1,277.08
*236 The respondent determined that the petitioners' records were inadequate and did not clearly reflect income. He computed the petitioners' income by the net worth method. The petitioners assign error as to the determination of the Commissioner as follows: (1) plead the statute of limitations as to all the years and contend that the proposed assessments of the deficiencies for all the years are barred by the statute of limitations; (2) the Commissioner erred in departing from the petitioners' books and records and in making his determination on the basis of increase in net worth; (3) the Commissioner erred in his determination of the understatement of petitioners' net income for all the years; (4) the Commissioner erred in his imposition of additions to tax under section 293(b) - petitioners deny that there was any fraud for any of the taxable years; and (5) the Commissioner erred in his imposition of additions to tax under section 294(d) for any of the years. Respondent, by his answer, alleges fraud for all years and that these proceedings are timely under section 276(a). In addition he alleges *237 that the proceeding for the year 1945 is timely under the 5-year period of limitation of section 275(c). Findings of Fact A stipulation of facts has been filed and is incorporated herein by this reference. Vernie S. Belcher, hereinafter referred to as petitioner, and Bessie L. Belcher, husband and wife, are residents of Bluefield, West Virginia. The following individual returns were filed with the collector of internal revenue at Richmond, Virginia: Type of
Date
Taxpayer
Return
Year
Filed
Petitioner
Separate
1942
3/15/43
Petitioner
Separate
1943
3/10/44 *
Petitioner
Separate
1944
3/ 8/45
Petitioner
Separate
1945
3/20/46
Petitioner
Separate
1946
5/12/47 *
Petitioner
Separate
1947
3/ 1/48
Petitioner and
Wife
Joint
1948
3/ 2/49
Waivers, "Consent Fixing Period of Limitation upon Assessment of Income and Profits Tax" (Form 872), for the taxable year ended December 31, 1945, were signed by the petitioner (and the Commissioner) as follows: Date
Extending
Executed
Period to
January 29, 1951
June 30, 1952
March 28, 1952
June 30, 1953
May 14, 1953
June 30, 1954
May 19, 1954
June 30, 1955
April 28, 1955
June 30, 1956
*238 Respondent mailed his notices of deficiency to petitioner on June 18, 1956. Petitioner attended school through the fifth grade and at the age of 16 began working. From 1922 to 1942, he worked for his brother, James B. Belcher, in the lumber business at salaries ranging from $150 to $225 per month. During 1942, petitioner purchased a one-half interest in his brother's lumber business which was known as the Elk Garden Lumber Company, hereinafter referred to as the Lumber Co. Petitioner and his brother operated the Lumber Co. as a partnership until March 18, 1946, when he purchased his brother's share. Thereafter, petitioner operated it as a sole proprietorship. The Lumber Co. operated a mill located at Doran, Virginia, manufacturing rough lumber which was primarily sold in carload lots. However, a small amount of retail business was transacted. Petitioner was not familiar with accounting or bookkeeping methods. He spent very little time in the office of the Lumber Co. Practically all of his time was devoted to the physical operation of the mill. He worked at least 10 hours and sometimes 12 or 13 hours a day at the mill. The books and records of the Lumber Co. were kept by R. *239 T. Lindsey, who had been a bookkeeper, primarily for lumber companies, since 1919. The books, which were a double entry system, and records of the Lumber Co. consisted of a cash receipts and disbursements journal, a sales ledger, a general ledger, an accounts receivable ledger, copies of invoices and paid bills, duplicate deposit tickets, canceled checks, and bank statements. The sales invoices were not consecutively numbered but were recorded on the books in chronological order. The invoices were under the control of Lindsey. Petitioner usually opened the incoming mail but Lindsey also did it part of the time. The Lumber Co. maintained checking accounts at the First National Bank of Lebanon, Virginia, and at the First National Bank of Richlands, Virginia, during the years 1942 to 1948, inclusive. Lindsey did not reconcile the cash balance as shown by the bank statements with the cash balance as shown by the books. At the end of each year Lindsey, from the books, would prepare a trial balance, depreciation schedule, profit and loss statement, and balance sheet. In addition to his interest in the Lumber Co., the petitioner engaged in certain other business activities. He owned *240 two or three coal loading docks, the transactions (receipts, expenditures, etc.) of which were not recorded on the books of the Lumber Co. Lindsey did not keep any books for these coal loading docks. Petitioner constructed and sold five or six small houses in the years 1946 to 1948. He kept certain memoranda, notes, and documents concerning the houses but did not keep records of the transactions in formal books. The lumber used in construction was taken from the mill of the Lumber Co. and was charged to petitioner's drawing account at cost. Also, for a short period of time the petitioner owned a circular mill at Grundy, Virginia. The lumber from that mill was brought over to the Doran mill to be sold and the transactions of that mill were recorded on the books of the Lumber Co. Petitioner's returns for at least the years 1945 to 1948 were prepared by Raymond Hull, certified public accountant of the public accounting firm of A. T. Hull & Sons, who had lived in an apartment next door to petitioner's apartment in Richfield, Virginia. At the end of the year, Hull would secure copies of the financial statements of the Lumber Co. from either the petitioner or Lindsey. In addition, petitioner *241 would give Hull all of the notes, memoranda, and other records that he had concerning his other business transactions. Hull did not audit petitioner's affairs but prepared the returns from the information that he received from petitioner. Petitioner, with his limited education, was entirely unfamiliar with and did not comprehend the various provisions of the income tax law. He signed and filed the returns prepared by Hull without examining them. Hull died several years ago and his testimony was, therefore, unavailable to petitioner at the hearing. Petitioner's returns showed the following: 1942
1943
1944
1945 [1]
Adjusted G. I. Lumber
Co.
Salary
$ 3,300.00
$3,600.00
$ 9,098.43
Share of partner-
ship
7,226.17
5,681.97
4,859.23
$15,610.25
Sole proprietorship
Interest
280.00
167.73
Rent
Sale of property
Sale of capital as-
sets (long-term
50%)
Total
$10,806.17
$9,281.97
$14,125.39
$15,610.25
Deductions
1,057.41
445.94
1,029.85
927.76
Net Income
$ 9,748.76
$8,836.03
$13,095.54
$14,682.49
1946
1947
1948
Adjusted G. I. Lumber
Co.
Salary
Share of partner-
ship
$ 9,738.97
Sole proprietorship
30,625.75
$58,002.40
$72,932.00
Interest
105.27
387.19
Rent
100.00
Sale of property
5,567.98
Sale of capital as-
sets (long-term
50%)
776.75
957.85
Total
$45,932.70
$58,984.42
$74,277.04
Deductions
888.31
1,628.70
2,318.16
Net Income
$45,044.39
$57,355.72
$71,958.88
*242 Respondent determined that "In the absence of adequate records, your [petitioner's] taxable net income has been computed upon the basis of increase in net worth during the taxable years with adjustment for personal and other nondeductible amounts paid." The net worth schedule (summarized) upon which the respondent's determination of income was based is as follows (.00 omitted): 1/1/42
12/31/42
12/31/43
12/31/44
Assets: Cash
$ 1,340
$ 1,899
$ 6,572
$ 7,553
Accts. & Notes Rec.
9,753
5,720
5,720
2,863
Real Est. & Imprmnts.
1,350
1,350
1,350
14,350
Other Assets
575
16,376
19,831
22,251
Total Assets
$13,019
$25,345
$33,474
$47,019
Liabilities: Notes & Accts. Pay.
940
1,000
0
2,000
Deprn. Res.
57
172
287
402
Other Liab.
0
0
0
0
Def. Inc.
0
0
0
0
Total Liab.
997
1,172
287
2,402
Net Worth
$12,021
$24,173
$33,186
$44,616
Less: Beg. net worth
$12,021
$24,173
$33,186
Inc. net worth
$12,151
$ 9,013
$11,430
Nonded. Expend.
4,392
5,703
8,514
Total
$16,544
$14,716
$19,944
Nontax. Inc. & Ded.
709
330
718
Net Inc. Corrected
$15,834
$14,385
19,226
Net Inc. per ret.
9,748
8,836
13,095
Understatement of Net
$ 6,085
$ 5,549
$ 6,130
Inc.
*243 12/31/45
12/31/46
12//31/47
12/31/48
Assets: Cash
$19,970
$ 46,228
$ 82,538
$ 72,503
Accts. & Notes Rec.
2,701
6,005
9,616
21,335
Real Est. & Imprmnts.
15,600
27,112
25,164
45,640
Other Assets
23,912
54,481
64,326
111,412
Total Assets
$62,184
$133,827
$181,645
$250,892
Liabilities: Notes & Accts. Pay.
0
653
0
0
Deprn. Res.
517
0
0
0
Other Liab.
0
975
400
0
Def. Inc.
0
0
1,653
4,805
Total Liab.
517
1,628
2,053
4,805
Net Worth
$61,667
$132,199
$179,592
$246,087
Less: Beg. net worth
$44,616
$ 61,667
$132,199
$179,592
Inc. net worth
$17,050
$ 70,532
$ 47,392
$ 66,494
Nonded. Expend.
9,393
15,761
30,844
42,557
Total
$26,443
$ 86,294
$ 78,237
$109,052
Nontax. Inc. & Ded.
552
888
2,365
2,600
Net Inc. Corrected
$25,891
$ 85,405
$ 75,872
$106,452
Net Inc. per ret.
14,682
45,044
57,355
71,958
Understatement of Net
$11,208
$ 40,361
$ 18,516
$ 34,493
Inc.
Petitioner's returns were investigated by revenue agent Evans and special agent Skeens in connection with an investigation of the returns of petitioner's brother, J. B. Belcher. Petitioner cooperated fully with *244 the revenue agents, making available to them any and all information that he had pertaining to his income. Petitioner continued to cooperate after he was notified that anything he said might be used against him. Petitioner is a man of good character and bears a good reputation in his community for truthfulness, honesty, integrity, and hard and industrious work. The revenue agents, in their investigation of petitioner's affairs, found, inter alia, the following: (1) Unreported Interest Income - In addition to the interest income which was reported by petitioner, supra, he had the following amounts of interest income which were not reported on his returns.. 1943
$143.30
Boone
Note
1945
131.41
Boone
Note
1946
213.61
Boone
Note
1947
152.44
Boone
Note
1948
216.70
Boone,
Pedigo & Lance
Notes
The unreported interest shown above consists of the portion of payments on certain notes (1943-1947 notes of C. R. Boone; 1948 notes of C. R. Boone, E. E. Pedigo, and C. C. Lance) that was applied to interest. Petitioner did not know how the interest was computed on these notes. (2) Checks Unrecorded on Lumber Co.'s Books - The revenue agent found *245 that the following checks which were made payable to the Lumber Co. were not recorded on the Lumber Co.'s books and were deposited in the petitioner's personal bank account: Maker
Date
Payee
Amount
Pa. Casualty Co.
7/19/44
Lumber Co.
Sam Finley, Inc.
9/12/44
Lumber Co.
$175.00
F. H. Hill Corp.
5/23/45
Lumber Co.
C. W. Askew
9/10/46
Lumber Co.
207.50
W. B. Winner
10/ 7/46
Lumber Co.
467.43
C. W. Askew
1947
Lumber Co.
557.48
E. S. W. Elswick
12/24/47
Lumber Co.
105.06
E. S. W. Elswick
12/24/47
Lumber Co.
35.80
(3) Other Items (a) - The revenue agent found that early in 1946 a deposit in the amount of $1,550 was made in the Lumber Co.'s bank account, which was not recorded on the Lumber Co.'s books. Subsequently, two checks for the total amount of $1,550 were drawn by the Lumber Co. payable to petitioner and J. B. Belcher. These two checks were not recorded on the Lumber Co.'s books. Petitioner's check was deposited in his account on February 13, 1946. (b) Clark Stores in 1946 issued a check payable to the Lumber Co. in the amount of $743.94 for lumber. This sale was not recorded on the Lumber Co.'s books. (c) On January 14, 1947, a *246 deposit in the amount of $1,886.32 was made in the Lumber Co.'s bank account which was not recorded on the Lumber Co.'s books. A Lumber Co. check in the amount of $1,599.85 was made payable to Crowder & Freeman for the purchase of a Nash "600" automobile for Bessie Belcher. On June 17, 1947, a Lumber Co. check which was unrecorded on its books was made payable to petitioner in an amount which, when added to the $1,599.85 check plus $5.25, equaled $2,286.32, or $400 more than the $1,886.32 deposit. On March 6, 1948, there was a deposit in the Lumber Co.'s bank account in the amount of $400 which was not recorded on its books. (d) The Lumber Co.'s books showed the sale of a Reo truck on February 13, 1948, to petitioner for $1,725. A deposit ticket dated February 13, 1948, showed a deposit in the Lumber Co.'s bank account consisting of the following checks payable to the Lumber Co.: Maker
Amount
Pond Creek Pocahontas Co.
$1,546.40
Pond Creek Pocahontas Co.
149.60
S. S. Pierce
10.00
Albert Ball
19.00
$1,725.00 These checks were recorded as receipts from the sale of the truck to petitioner but were not shown as receipts from the respective makers. (e) On *247 December 10, 1947, the Lumber Co. purchased a used 1947 Ford truck from Crowder & Freeman. The duplicate original of the Crowder & Freeman invoice (from the files of that company) shows the price of the truck to be $1,650. The original of the Crowder & Freeman invoice (from the Lumber Co.'s files) shows the price to be $650. However, there is a typewritten impression on the original of a "1," prior to the $650. There does not appear to have been an erasure of the "1." The Lumber Co.'s files also contain a Crowder & Freeman invoice dated December 10, 1947, for 10 truck tries in the total amount of $1,000. The Lumber Co. paid Crowder & Freeman $1,650 and entered the transaction as a purchase of a truck for $650, which was capitalized, and the purchase of 10 tries for $1,000, which was charged to expense. No part of the deficiency for the years 1942 to 1948 is due to fraud with the intent to evade tax. The returns for the years 1942 to 1948 are not false or fraudulent with the intent to evade tax. Opinion BLACK, Judge: The respondent determined deficiencies in income tax and additions thereto for fraud under section 293(b) for the years 1942 to 1948. The notice of deficiency was *248 sent over 7 years after all of the returns for the years in question were filed. Therefore, all of the years, except the year 1945 which is still open under the 5-year period of limitation provided in section 275(c) due to waivers which were filed, are barred unless the respondent has proved, by clear and convincing evidence, that the returns were false or fraudulent with the intent to evade tax. At the outset of our discussion, we think it is well to point out that this is not a case where some gambler or criminal is shown to have had large amounts of income in the taxable years and has returned only small amounts of it for income taxation. Petitioner is a reputable business man in his community and has been so for many years. At the hearing of this proceeding the Judge of the Criminal Court of Mercer County, West Virginia, the president of the Commercial Bank of Bluefield, West Virginia, and a lieutenant of the Police Department of Bluefield, all testified as to petitioner's good character and as to his good reputation as a businessman in that community and as to his good reputation for truth and veracity. It was upon this testimony in the record that we made the finding in our *249 Findings of Fact which states: "Petitioner is a man of good character and bears a good reputation in his community for truthfulness, honesty, integrity, and hard and industrious work." As we have already stated above, this is not a case where the petitioner had large amounts of income and returned only small amounts of it for taxation. For example, our Findings of Fact show that in 1946 petitioner returned $45,044.39 of net income, in 1947 he returned $57,355.72 of net income, and in 1948, the last year we have before us, he and his wife returned on a joint return $71,958.88 of net income. The stipulation of facts shows that petitioner paid taxes on these amounts and the stipulation shows the taxes which he paid in the respective years. The amounts of these taxes paid add up to a very substantial sum. True it is that respondent, in his deficiency notice, by use of the net worth method, has considerably increased the amounts of petitioner's net income in the respective taxable years. As to many of the items in respondent's net worth computation, petitioner agrees in a stipulation of facts which has been filed; as to others, petitioner does not agree. After hearing all of the evidence, *250 including the facts which have been stipulated, we are convinced that petitioner did omit from his returns taxable income in some of the taxable years, if not all of them. But petitioner has pleaded the statute of limitations as to all the years and it clearly has run as to all the years, except possibly the year 1945, and it bars the assessment of the deficiencies, if any. Therefore, unless there was fraud, we are precluded from inquiry into the deficiencies. The statute of limitations was enacted by Congress for the benefit of the Government, as well as the taxpayers. We must give it effect where it is applicable. At the hearing of this proceeding the petitioner introduced evidence, including that which had been stipulated, showing that the statute of limitations had run for all the taxable years. Petitioner then rested his case. Respondent then introduced evidence in support of his net worth determination and in support of his determination of fraud. After respondent had rested his side of the case, petitioner introduced considerable testimony of his own, principally directed to rebutting respondent's evidence on the issue of fraud. He did not introduce any schedule prepared by *251 an accountant who had analyzed his books and records showing what his net income was in each of the taxable years. On that point he contented himself with testimony by his bookkeeper for the lumber business, Lindsey, that the books and records which he kept were in the main correct and that any errors were unintentional. Petitioner also testified that the returns which he filed for each of the taxable years and which were prepared for him by Hull, a certified public accountant now deceased, were believed by him to be correct. He testified that any errors which there may have been in these returns were unintentional errors and not wilfully made by him. As we have already stated, we feel well convinced that there were omissions of income from petitioner's returns in some of the years, if not all of them. He was clearly negligent in not keeping better records than he did of some of his outside activities from which taxable income was derived. In the main, his books and records of the lumber business from which undoubtedly the main part of his income was derived seem to have been kept reasonably well, though undoubtedly some errors were made in these books and records of the Lumber Co. *252 We do not understand that petitioner now disputes that this latter fact is true. But, after hearing all the evidence pro and con, we do not feel that the Commissioner has sustained his burden of proof of showing fraud by clear and convincing evidence and we have so found in our Findings of Fact. Petitioner only had a fifth grade education. He began work at an early age and for many years worked for his brother, who owned the Lumber Co. In 1942, he purchased an interest in the Lumber Co. from his brother and became a partner. And in 1946, he purchased his brother's remaining interest and became the sole proprietor of the Lumber Co. Petitioner did not have any knowledge of bookkeeping or accounting methods or practices. The Lumber Co.'s books were maintained by Lindsey, an experienced bookkeeper. In addition to his activities involving the Lumber Co. to which he devoted from 10 to 12 hours per day, petitioner also built and sold a few houses in the years 1946 to 1948 and owned two or three coal loading docks. No formal financial records were kept of these activities. At the end of each year Lindsey would close the Lumber Co.'s books and prepare financial statements. These, as *253 we have already stated, in addition to certain notes and other memoranda on petitioner's other activities which were kept by petitioner, were turned over to Hull, a certified public accountant. Petitioner or Lindsey would also supply any other information which Hull requested. Hull would prepare the petitioner's returns from this data. Petitioner relied entirely upon Hull and signed the returns without checking them. There is no direct evidence of fraud in this case. However, direct evidence is seldom available and it is not necessary to establish the respondent's contention by direct evidence. But the circumstantial evidence relied upon by the respondent must be clear and convincing. Even gross negligence is not the equivalent of fraud. "Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed. Mere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud." L. Glenn Switzer, 20 T.C. 759, 765 (1953), and cases there cited. Respondent relies upon the consistent understatements of income shown by the net worth computation and various specific transactions as evidencing a fraudulent *254 intent. Regarding the specific transactions upon which the respondent relies as evidencing fraud, we think that at most they arouse a suspicion of fraud - we do not agree that they establish fraud. First, the total amount involved in these transactions is de minimis when considered in relation to the amount of business transacted by petitioner. Secondly, only the unreported interest on one note for the years 1943, 1945, 1946, and 1947 and three notes for 1948 clearly represents income. It is probable that at least some of the unrecorded checks did represent gross income to the petitioner but it is clear that at least some of these checks represented non-income-producing transactions. Regarding the purchase of the Ford pickup, we cannot, under the evidence, attribute an alteration of the invoices, if there was one, to the petitioner. After viewing all of the specific transactions upon which the respondent relies, separately and together, we cannot say that they are clear and convincing evidence of fraud. We certainly think that petitioner was guilty of negligence in his failure to keep proper records of some of his business transactions but, as we have already stated, a showing *255 of negligence, however inexcusable it may be, will not sustain the Commissioner's determination of fraud. On the issue of fraud, we hold for the petitioner. As stated previously, the year 1945 is still open under the 5-year period of limitation provided in section 275(c), even though there is no finding of fraud. In order to prevail on this issue the respondent, upon whom the burden of proof lies, C. A. Reis, 1 T.C. 9 (1942), must show that the petitioner omitted from gross income an amount in excess of 25 per cent of the amount of gross income stated in the return. Section 275(c). The petitioner's return for 1945 was made up of his share of partnership net income in the amount of $15,610.25 and itemized deductions in the amount of $927.76, leaving a net income of $14,682.49. The Commissioner's net worth statement shows net income of $25,891.41 and unreported net income of $11,208.92 ($25,891.41 minus $14,682.49). On these facts we cannot hold that the respondent has met his burden of proof in this respect. Under Jack Rose, 24 T.C. 755, 766-770 (Issue 1) (1955) and the respondent's own ruling, see Rev. Rul. 55-415, 1955-1 C.B. 412, the *256 gross income of a member of a partnership is his proportionate share of the gross income of the partnership and the partner's share of the gross income on the partnership returns must be imputed to the individual return. The partnership return not being in evidence, we do not know the "gross income stated in the return" and the computation under section 275(c) is impossible. Even if the partnership return was in evidence, it is unlikely that we could sustain the respondent because "In order to equate the unreported net income to omitted gross income, it is incumbent upon the respondent to show that the unreported net income results from omitted gross income rather than from excessive deductions. H. A. Hurley, 22 T.C. 1256, 1264-1265 (1954), affirmed on another point (C.A. 6, 1956) 233 Fed. (2d) 177." David Courtney, 28 T.C. 658, 668 (1957). Decisions will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended.↩
*. Extension from 3/15/47 to 5/15/47 granted.↩
1. Petitioner's income for the year 1945 was reported in his return for that year under Schedule E of the return which has the heading "Income from Partnerships, Estates and Trusts, and other Sources." In that schedule he reported income from Elk Garden Lumber Co. partnership, Richlands, Virginia, of $15,610.25. Deductions of $927.76 were taken on the return but none of them related to the partnership.↩